IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY R., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 19 C 353 ) ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner of Social Security,[1] | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**[2]

Plaintiff, Gregory R.,[3] applied for disability insurance benefits ("DIB") on June 9, 2015, alleging disability beginning August 22, 2011, when he was 50 years old. (R. 163.) His date last insured ("DLI") was September 30, 2013. After Plaintiff's application was denied initially and on reconsideration, the ALJ held a hearing on January 19, 2018. (R. 315.) On April 9, 2018, the ALJ issued a written opinion denying Plaintiff's benefits application, and on November 13, 2018, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1), making the

---

[1]The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2]On February 22, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 6.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 11.)

[3]The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

ALJ's decision the final decision of the Commissioner. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Plaintiff now moves to remand the Commissioner's decision (D.E. 9), and the Commissioner has moved to affirm. (D.E. 18.) For the reasons set forth below, the Court denies Plaintiff's motion and grants the Commissioner's motion.

**I.     Administrative Record**

    **A.     Evidence Preceding the Date Last Insured**

Plaintiff worked as a bricklayer for his entire adult life, despite having surgery on his left wrist in 2005 or 2006 and needing fluid drained from his knees twice a year since the late 1980s. (R. 57, 287.) His last day of work was August 22, 2011, when he felt a sudden weakness and pain in his right wrist while laying bricks. (R. 287.) Plaintiff was diagnosed with a sprain and received steroid injections in his right wrist during the last few months of 2011; on October 24, 2011, his doctor placed him at maximum medical improvement with light duty restrictions.[4] (*Id.*)

On March 8, 2012, Plaintiff met with orthopedic surgeon John Fernandez, M.D. (R. 287.) Plaintiff reported taking ibuprofen for right wrist pain, which he rated as a five out of 10. (R. 287-88.) Dr. Fernandez diagnosed Plaintiff with scapholunate ligament ("SL") instability in his right wrist with chronic pain and opined that Plaintiff could do light work using a maximum of 10 to 20 pounds of force. (R. 289.) Dr. Fernandez did not believe "conservative measures w[ould] be of any significant benefit" to Plaintiff (R. 289-90), and in April 2012, Dr. Fernandez and Plaintiff agreed Plaintiff would undergo ligament reconstruction on his right wrist despite a "very guarded prognosis regarding his recovery, particularly his ability to return to heavy work." (R. 285.) On May 14, 2012, Dr. Fernandez performed the surgery (R. 293), and on July 30, he surgically removed the hardware and scar tissue from Plaintiff's right wrist. (R. 291.)

---

[4]These medical reports are not in the record, which does not contain medical reports before March 2012.

At a post-operative visit on August 14, 2012, Dr. Fernandez observed Plaintiff had full wrist range of motion, but mildly limited flexion secondary to pain. (R. 279.) X-rays of Plaintiff's right wrist were essentially normal, and Dr. Fernandez recommended Plaintiff continue occupational therapy, which he had begun that month. (R. 279, 296.) On September 13, 2012, Plaintiff reported to Dr. Fernandez that his symptoms had improved overall, but that his right wrist pain was still at a five out of 10, with some residual numbness. (R. 277.) Dr. Fernandez limited Plaintiff to light duty work applying no more than five pounds of force with his right arm and recommended additional therapy and work hardening. (R. 278.)

On November 20, 2012, Plaintiff reported that with occupational therapy, he went from being unable to lift five pounds to being able to lift 15 pounds. (R. 275.) On examination, Dr. Fernandez observed mild swelling on the right wrist and mild discomfort with palpation to the SL ligament. (*Id*.) Plaintiff had full digital range of motion but his wrist extension and flexion were still limited. (*Id*.) Dr. Fernandez ordered six more weeks of work conditioning and limited Plaintiff to light duty work and lifting up to 10 pounds with his right arm. (R. 276, 305.) At a follow-up visit on January 8, 2013, Plaintiff still had mild swelling and discomfort along the wrist, full digital range of motion and limited wrist extension flexion and extension. (R. 273.) Dr. Fernandez opined that Plaintiff had reached maximum medical improvement and would not be able to return to work as a bricklayer. (R. 274.) Dr. Fernandez gave Plaintiff permanent restrictions of using less than 20 pounds of force with his right upper extremity. (*Id*.)

The next report in the record is dated July 2015, when a non-examining state agency physician opined that before his DLI of September 30, 2013, Plaintiff could perform light work with limited handling and fingering on his right side. (R. 77-78.) This opinion was affirmed on reconsideration. (R. 85.)

### B. Evidence After the Date Last Insured

The medical record picks up again on October 23, 2015, more than two years after Plaintiff's DLI, with a report from a pre-treatment physical indicating Plaintiff had moved to Minneapolis to receive inpatient treatment for drugs and alcohol. (R. 324.) The report noted Plaintiff had chronic left shoulder pain and bilateral carpal tunnel syndrome. (*Id*.)

In December 2015, Plaintiff began regular treatment with psychiatrist Ali Ebrahimi, M.D. Dr. Ebrahimi diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD") and prescribed guanfacine and Straterra to control the symptoms. (R. 365-82, 549.) Dr. Ebrahimi also prescribed Remeron (an anti-depressant) and Trazadone to help Plaintiff sleep. (*Id*.)

In February 2016, Plaintiff completed inpatient drug and alcohol treatment. At an appointment that month, family medicine doctor David A. Goodman, M.D. congratulated Plaintiff on his sobriety and prescribed Ambien to help him sleep and 800 mg of ibuprofen every eight hours as needed for pain (unspecified).[5] (R. 327-28.) On May 5, 2016, William Youmans, M.D., another physician in Dr. Goodman's practice, wrote a letter stating Plaintiff was "still having wrist bilateral pain and range of motion is restricted and same restrictions." (R. 330.) On June 30, 2016, Dr. Goodman reported that x-rays showed some arthritis in Plaintiff's right shoulder joint, and he received a steroid injection for associated pain. (R. 333, 503.) Throughout 2016, Plaintiff continued to have limited wrist flexion and extension and right shoulder pain. (R. 507-09.)

On May 24, 2017, Plaintiff sought treatment from an arthritis clinic for severe pain in his knees; he reported that the pain had begun "gradually" ten years earlier. (R. 341.) Plaintiff was given an intra-articular injection in both knees. (R. 358.) X-rays showed mild to moderate to severe joint space narrowing, and Plaintiff was diagnosed with knee osteoarthritis. (R. 348, 449.)

---

[5] https://www.mayoclinic.org/drugs-supplements/guanfacine-oral-route/description/drg-20064131.

On January 2, 2018, Dr. Goodman filled out an assessment opining on Plaintiff's physical residual functional capacity ("RFC") as of that date. Dr. Goodman opined that Plaintiff, who had pain in his wrists, shoulders and knees, could sit, stand or walk (without an assistive device) for six hours in an eight-hour workday, but he would need to move around after one hour of sitting and sit after walking or standing for 30 minutes. (R. 554-56.) In addition, Plaintiff had significant limitations with reaching, handling and fingering with both hands and was limited to lifting and carrying less than five pounds constantly. (R. 556-58.)

On January 8, 2018, Dr. Ebrahimi filled out a mental RFC statement. Dr. Ebrahimi listed Plaintiff's diagnoses as ADHD, combined type, severe cocaine use disorder and carpal tunnel disorder, and he opined that Plaintiff's impairments had been present since before August 2011. (R. 561.) Dr. Ebrahimi opined that based on Plaintiff's physical and mental limitations in combination, he would be off-task more than 30 percent of an eight-hour workday. (R. 562-63.)

**II.     Evidentiary Hearing**

On January 19, 2018, Plaintiff testified at a hearing before the ALJ. With regard to the time before his DLI, Plaintiff testified that since his surgery in 2011, he has not been able to lift 10 to 20 pounds consistently and repetitively for six to eight hours per day. (R. 59-60, 65-66.) In addition, since 2015, his pain in both hands had worsened, and he took tramadol (a narcotic) and Advil as needed, which "help[ed] a lot." (R. 60, 64-65.) Also since 2015, Plaintiff had pain in his knees that made it hard for him to stand or walk for long periods of time; he wore a knee brace, got cortisone shots in his knees and used a cane when he had to be on his feet a long time. (R. 57-58, 62.) Plaintiff also testified that he has had problems with attention and concentration for the last five to seven years. (R. 63.) He did "not really" have difficulty doing household chores; he just took his time and took extra breaks. (R. 63-64.)

5

The vocational expert ("VE") testified that Plaintiff performed his past work as a bricklayer at a very heavy level. (R. 67.) In response to hypothetical questions by the ALJ, the VE testified that a significant number of jobs existed in the national economy for an individual limited to light work and frequent or occasional handling bilaterally. (R. 68.)

### III.   ALJ's Decision

On April 9, 2018, the ALJ issued an opinion finding Plaintiff was not under a disability within the meaning of the Social Security Act from his alleged onset date of August 22, 2011 through his DLI of September 30, 2013.[6] (R. 29.) At Step One, the ALJ found that Plaintiff did not engage in substantial gainful activity from his onset date through his DLI. (R. 31.) At Steps Two and Three respectively, the ALJ found that through his DLI, Plaintiff had the severe impairments of right wrist SL instability with chronic pain and subsequent repair and status post remote left wrist surgery, and that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. (*Id.*) The ALJ found that "[t]here is little evidence that any impairments . . . were present during the relevant period of alleged disability" beyond the wrist impairments. (*Id.*) Through the DLI, the ALJ assigned Plaintiff an RFC to perform light work with frequent handling bilaterally based on Dr. Fernandez's opinion that Plaintiff could lift less than 20 pounds with his right upper extremity and Plaintiff's history of left wrist surgery. (R. 33, 37.)

The ALJ reviewed Plaintiff's testimony but found that his statements concerning the extent of his symptoms were not entirely consistent with the evidence of record. (R. 33.) Specifically, the ALJ emphasized several aspects of Plaintiff's pre-DLI treatment with Dr. Fernandez, including that their first meeting, on March 8, 2012, was "well after" Plaintiff injured his wrist in August 2011, Plaintiff's pain "was only a '5' on a ten-point scale" and Plaintiff was able to engage in light

---

[6]Claimants must establish that they became disabled on or before their DLI to qualify for DIB. *McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018).

activities. (R. 34.) In addition, the ALJ described Plaintiff's post-surgical treatment plan of occupational therapy and medication management as "conservative" and noted that Plaintiff's right wrist condition improved with occupational therapy. (R. 34-35.) Regarding Plaintiff's last appointment with Dr. Fernandez, on January 8, 2013, the ALJ stated: "[i]mportantly, this represents a significant improvement in the short period of five months." (R. 36.)

The ALJ further noted that "[t]he record does not contain any evidence that the claimant sought or received medical attention between his treatment encounter with Dr. Fernandez on January 8, 2013 through his date last insured on September 30, 2013." (R. 36-37.) The ALJ found that "the bulk of the medical evidence" was dated "well after his date last insured of September 30, 2013," and was "therefore not relevant to a finding of disability." (R. 37-38.) The ALJ further stated that "while it is at times reasonable to infer that evidence that occurs after the DLI could reasonably [be] related to functioning before the date last insured, Dr. Fernandez's observation notes, the claimant's reports of improve[d] symptomatology, and history of conservative treatment history following the claimant's surgeries weigh against that inference." (R. 38.)

Ultimately, relying on the VE, the ALJ found that at Step Four, Plaintiff could not perform his past relevant work as a bricklayer, but that at Step Five, jobs existed in significant numbers in the national economy that the claimant could have performed with his RFC. (R. 38-39.)

**IV.  Analysis**

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal citations and quotations omitted). "An

7

ALJ need not address every piece of evidence," but must "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

### A. Evidence Post-Dating the Date Last Insured: Plaintiff's Knees and ADHD

Plaintiff primarily argues this Court should reverse and remand the ALJ's decision because the ALJ erred in finding the medical records that post-dated his DLI were irrelevant to assessing whether Plaintiff was disabled before his DLI. (Pl.'s Br. at 6-7.) Plaintiff contends this led the ALJ to ignore evidence that he had a knee impairment and ADHD before his DLI. (*Id*. at 8-9.)

Indeed, the ALJ did not discuss any of Plaintiff's treatment records post-dating his DLI, including the 2018 treating source opinions and Plaintiff's 2017 self-report that his knee pain began gradually ten years earlier. (*Id*. at 9-10.). The ALJ explained:

> the bulk of the medical evidence of record occurred well after the claimant's date last insured in September 30, 2013. There is little evidence that any impairment beyond those discussed above [right and left wrist issues] were present during the relevant period of alleged disability. Accordingly, there is no need to discuss the effects of these conditions because they have no relevance to the claimant's ability to perform physical or mental work activities prior to his date last insured.

(R. 31.) The Court finds that the ALJ's determination that this evidence was not relevant was supported by substantial evidence. Alternatively, to the extent the ALJ disregarded this later evidence, rather than discounting it after review, any error was harmless.

### 1. The ALJ's Consideration of the Post-DLI Evidence

Here, as in *Eichstadt v. Astrue*, 534 F.3d 663 (7th Cir. 2008), the post-DLI evidence in the record "provided no support for the proposition that [the claimant] was disabled at any time prior to" his DLI. *Id.* at 666. The claimant in *Eichstadt*, like Plaintiff here, argued that "the ALJ committed reversible error by refusing to consider evidence that post-dated [the claimant's] date last insured." *Id*. at 667. However, like the Seventh Circuit, we find that "it is evident from the ALJ's decision that she did not 'fail to consider' this evidence, but instead she examined it as

8

required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period." *Id*.

The ALJ properly relied on "the absence of . . . medical treatment prior to the date last insured" in finding Plaintiff was not disabled. *Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013). *See Capman v. Colvin*, 617 F. App'x 575, 580 (7th Cir. 2015) ("an ALJ may take the lack of medical evidence into account, as the ALJ did here.") "What the record was missing was testimony from any physician providing anything more than conclusory support for the proposition that one might be able to infer" that evidence of the claimant's impairments years after the his DLI indicated that he had those limiting conditions years earlier. *Eichstadt*, 534 F.3d at 667. *See also McHenry v. Berryhill*, 911 F.3d 866, 872 (7th Cir. 2018) ("A medical advisor's retrospective diagnosis may be considered only if corroborated by evidence contemporaneous with the period of eligibility") (internal quotations and citation omitted).

In this case, the first indication in the record that Plaintiff had ADHD was in the 2018 report from Dr. Ebrahimi, more than four years after Plaintiff's DLI. Although Dr. Ebrahimi speculated Plaintiff would have had symptoms of ADHD before August 2011, the doctor did not meet Plaintiff until the end of 2015, and there is no pre-DLI evidence that Plaintiff had any such symptoms, much less that they were functionally limiting. Indeed, Dr. Goodman's 2018 RFC opinion does not even suggest that Plaintiff's knees caused him any limitations five years earlier. To the contrary, the record contains evidence that Plaintiff continued to work as a bricklayer despite periodically receiving steroid injections in his knees, which is consistent with Plaintiff's 2017 report that he his knees gradually began worsening 10 years earlier. *See Penrod o.b.o. Penrod v. Berryhill*, 900 F.3d 474, 478 (7th Cir. 2018) (upholding ALJ's denial of DIB where claimant, who had a heart attack two years after his DLI, "experienced occasional chest pain . . . that was

controlled with medication" before his DLI, and claimant did "not explain how any latent heart problems imposed functional limitations.") Therefore, the ALJ did not err in finding that the evidence post-dating Plaintiff's DLI was irrelevant and in declining, therefore, to assign Plaintiff any lower extremity or mental health limitations.

### 2. Harmless Error

Alternatively, any error by the ALJ in failing to consider the medical evidence post-dating Plaintiff's DLI was harmless. An error is harmless if the Court is convinced that the ALJ would reach the same result on remand. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). This Court is convinced that the ALJ would reach the same result on remand because the ALJ's decision that the post-DLI evidence is not relevant to the question of whether Plaintiff was disabled pre-DLI is "overwhelmingly supported" by the entire record. *Schloesser v. Berryhill*, 870 F.3d 712, 721 n.4 (7th Cir. 2017) (questioning whether records from two years after claimant's DLI were relevant, but holding that even if they were, the post-DLI evidence did not provide support for claimant's allegation that he was disabled prior to his DLI). Thus, the ALJ's determination that post-DLI evidence of knee and mental health impairments was not relevant is not grounds for remand.

### B. Plaintiff's Upper Extremity Limitations

Next, Plaintiff argues that the ALJ did not adequately account for Plaintiff's wrist impairments in his RFC. In the opinion, the ALJ assigned Plaintiff an RFC to perform light work with frequent handling bilaterally. (R. 33.) Plaintiff argues the ALJ should have found him disabled or limited to sedentary work or occasional handling. (Pl.'s Br. at 6-7.)

It is well-settled that the ALJ must "cite[] to relevant evidence adequate to support" the RFC. *Schloesser*, 870 F.3d at 720. An RFC assessment will not be overturned where "[t]he ALJ

10

thoroughly discussed the medical and other evidence and carefully considered each of [Plaintiff's] impairments and related functional deficits" before assigning an RFC. *Summers*, 864 F.3d at 527. The ALJ met this standard.

In determining that Plaintiff was limited to light work with frequent handling, the ALJ relied on the limited nature of Plaintiff's post-surgical treatment, the improvement he made with this treatment, and Dr. Fernandez's opinion on Plaintiff's limitations. The ALJ noted that Plaintiff waited until March 8, 2012, "well after" he injured his wrist, to meet with the orthopedic surgeon, and even then, Dr. Fernandez opined that Plaintiff was able to engage in light activities. (R. 34.) Once Plaintiff had wrist surgery in May and July 2012, he pursued "conservative" treatment with medication management and physical therapy, after which the ALJ found Plaintiff experienced "significant improvement." (R. 36-37.) Indeed, the ALJ pointed out that Plaintiff's last appointment with Dr. Fernandez was on January 8, 2013, at which time he gave Plaintiff permanent restrictions of using less than 20 pounds of force with his right upper extremity, and Plaintiff did not seek or receive medical attention again until well after his DLI. (*Id*.) The ALJ properly considered that Plaintiff experienced improvement with physical therapy and medication, and she did not err in finding this post-surgical treatment not only "conservative," but short-lived. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (upholding finding based in part on "relatively conservative" treatment).

Furthermore, it is Plaintiff's responsibility to show the record supports "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk*, 923 F.3d at 498. However, Plaintiff's contention that he could not "sustain any repetitive movement with his upper extremities" is not supported by the record, which showed that Dr. Fernandez limited him to exerting less than 20 pounds of force with his right arm. (Pl.'s Br. at 12.) Moreover, contrary to

11

Plaintiff's contention that a limitation to occasionally handling would preclude all work (*Id.*), the VE testified that a significant, though fewer, number of jobs would still be available in that case.

### C. Credibility

Plaintiff also contends that the ALJ's credibility determination was erroneous because the ALJ "mischaracterize[ed]" the evidence as "sparse" despite "devot[ing] three single spaced pages to go through" it and "ma[king] the misleading assertion that there were no medical encounters until 7 months after injury." (Pl.'s Br. at 13-14.) The Court disagrees.

Initially, the Court finds nothing misleading about the ALJ's description of the evidence. The ALJ's three-page description covered only 10 months of treatment. And, the ALJ did not state that there were "no medical encounters" for seven months after Plaintiff's injury; rather, the ALJ recognized that Plaintiff told Dr. Fernandez he received steroid injections during this time, but correctly stated that reports of those encounters are not in the record. (R. 34.)

Neither was the ALJ's credibility determination erroneous. Courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). An ALJ's credibility determination is not patently wrong if the ALJ supported the determination with "specific reasons supported by the evidence." *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018).

The ALJ discounted Plaintiff's testimony of extreme functional limitations because the ALJ did not find it consistent with his reports to Dr. Fernandez, Dr. Fernandez's observations or the brief length of Plaintiff's post-surgical treatment. "Disregarding [a claimant's] subjective testimony where it contradicts with contemporaneous reports he made to his physicians and their independent observations is permissible." *Schloesser*, 870 F.3d at 721. Moreover, Plaintiff testified more than five years after his DLI, and "the ALJ's credibility finding was [also] grounded in the

12

lack of evidence available with respect to [Plaintiff's] condition during the critical period prior to [his] date last insured." *Eichstadt*, 534 F.3d at 668. "The claimant bears the burden of producing medical evidence that supports [his] claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time." *Id*. As the ALJ supported her credibility finding with specific reasons from the record, the Court does not find the ALJ's credibility determination was patently wrong.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 9) and grants the Commissioner's motion to affirm. (D.E. 18.)

                                            **ENTER:**

                                            **GABRIEL A. FUENTES**
                                            **United States Magistrate Judge**

**DATED: September 1, 2020**